EX- 1

FILED CR-700 AUG 23 2005 DOROTHY BROWN CLERK OF THE CIRCUIT COURT OF COOK COUNTY, IL

State of Illinois )
County of Cook )

**In The Circuit Court of Cook County, Illinois**
**Criminal Division**

**PEOPLE OF THE STATE OF ILLINOIS,** Plaintiff,

vs.

**RODNEY CLEMONS,** Defendant

**NO. 01 CR 23332**

**Motion To Vacate Verdict, Dismiss Proceedings And/Or Grant a New Trial**

Now comes the Defendant Rodney Clemons, by his attorney, William H. Laws, and requests this Honorable Court to vacate the verdict and judgments thereon, dismiss the proceedings against him with prejudice, or as a lesser favored alternative grant him a new trial; it being expressly understood that defense counsel has not yet been furnished with an official transcript of the trial and makes this motion on behalf of his client, without prejudice to or waiving the later discovery or error in the trial record.

In support of Defendant's foregoing Motion, it is respectfully represented to this Honorable Court:

1. The court committed reversible error in denying Defendant's pre-trial Motion to Quash Arrest and Suppress Evidence which basis relied upon is contained in Defense Counsel's Memorandum and Argument previously filed on May 6, 2003 and is incorporated by reference and attached hereto as Exhibit "A". Additionally, the mere fact that on an Order For Protection was found inside Doris Smith's purse with Rodney Clemons's name on it coupled with fact he had gone by her apartment looking for her earlier did not constitute probable cause to link Rodney to the shooting of Doris Smith. While the police knew a crime occurred, reasonable persons would not find this evidence enough to support a belief that Defendant committed it.

Thus, all oral statements attributed to Rodney Clemons while in police custody should have been suppressed.

2. The State failed to prove Defendant Clemons guilty of first-degree murder beyond a reasonable doubt. The eyewitness testimony in this case was unreliable for the following reasons:

## TESTIMONY OF DERRICK CLEMONS

Mr. Clemons testified at trial that he made a "911" call to the police upon observing two persons from a distance of 100 feet away at 1:54 a.m. from a second story rear attic to his house. His observation lasted a mere six (6) seconds before losing sight of the man chasing the woman as they ran west on 81st street along side an adjacent house which blocked Mr. Clemons view. During the "911" call to the police, Mr. Clemons described the offender as being male black, 20 years of age/ 5'7"/ Med/ Afro/ light colored shirt/ dark pants.

Within four minutes after the shooting occurred, Officer Murtaugh arrived on the scene and spoke to Derrick Clemons. The description of the offender given to Officer Murtaugh by Mr. Clemons was that the offender wore a light yellow or red shirt with dark pants. The offender was further described as male black, 20-25 years of age, 5'8", 160 pounds, black hair, and unknown complexion.

Later, while testifying before the Grand Jury, Derrick Clemons stated that the offender was <u>dark</u> complexion wearing a white shirt. Rodney Clemons is medium complexion. At no time during the "911" call to the police to report the shooting nor four minutes later when Officer Murtaugh appeared on the scene and spoke to Derrick Clemons was there any mention of the shooter's facial hair by Derrick Clemons. In fact, as evidenced by Rodney Clemons's line-up photograph-the Defendant had both a mustache and beard. Additionally the evidence showed the Defendant to be 39 years old at the time of his arrest-<u>twice</u> the age of the shooter in this case as described by Derrick Clemons.

Suffice to say, Derrick Clemons had a limited opportunity to view the shooter of Doris Smith and his initial description during his "911" call and the description given to

Officer Murtough upon his arrival at the scene conclusively shows the misidentification by Derrick Clemons of the Defendant as the offenders in this case.

## TESTIMONY OF MARIE JACKSON

Marie Jackson's testimony revealed that she was closest to the shooting at the time Doris Smith was shot. However, during the initial shots being fired in the alley to the rear of her house she admitted that her foremost concern was the safety of her disabled mother. She testified she saw two bodies (two figures) coming out of the alley going across the street (81st street) alongside the house.

According to Ms. Jackson "they" stopped on the corner and you could see they were people. Ms. Jackson testified that the shooter put the gun to the other person's head and shot twice.

Ms. Jackson testified she then stated upon viewing this shooting-he shot him. Tell the police he's been shot. Ms. Jackson immediately covered her eyes; she did not want to see anymore-she just lost it according to her testimony.

She testified she was thinking it was two young men she just observed. It was only later when the Detectives came to her house and told her it was a man and a woman.

Ms. Jackson unequivocally testified that she did not see the shooter's face. At best, she could only see the profile of the shooter's face.

During her Grand Jury testimony Ms. Jackson claims she was able to identify the shooter during the line-up according to the way his heads was shaved. Of course, the Defendant's head was not shaved upon his arrest.

It is clear that Ms. Jackson was in a heightened emotional state when the shooting occurred. The shocking nature of the incident and the fact that Ms. Jackson had never seen Rodney Clemons before makes her identification questionable. Furthermore, she testified she never saw the shooter's face.

Ms. Jackson's inability to recognize Doris Smith as a 200 pound woman wearing a wig and a leopard-skin dress with a purse clearly shows her powers of observation were lacking which led to the misidentification of Rodney Clemons as the offender in this case.

## TESTIMONY OF LIONEL POWE

This witness admitted he had drank two beers prior to his witnessing the shooting incident. He testified after the shooting he saw uniform officers arrive on the scene. Yet, he never walked across the street to inform the officers of what he had observed or heard. It is crucial to note that Mr. Powe claimed he had seen Rodney before in the neighborhood prior to the shooting during his testimony at trial four (4) years after the shooting. Of course, Detective Chapmon testified at trial Mr. Powe never mentioned anything to him regarding seeing Rodney in the neighborhood when he spoke to Mr. Powe during August. 2001.

Mr. Powe revealed at trial he had a Bi-Polar condition and was under medication and had been treated for depression.

At trial, Mr. Powe's power of observation was certainly not enhanced by his consumption of alcohol prior to the shooting. Had he seen Rodney in the neighborhood before the natural thing to do would have been to tell this to the first arriving police on the scene or at least to Detective Chapman when given an opportunity to do so. This he failed to do on two separate and distinct occasions. The fact that Mr. Powe suffered from a bi-polar condition at trial when testifying affected his ability to recall what occurred four years ago, which led to the misidentification in open court of Rodney Clemons as the offender in this case.

Finally, Mr. Powe's vantage point while making his observations was from the same location as Natalie Johnson. Ms. Johnson testified it was dark outside on the night of the shooting with overhanging trees on both sides of the street east of Houston on 81st street. Ms. Johnson identified two scene photographs which revealed the circumstances of darkness she and Mr. Powe made their mistaken observations.

## TESTIMONY OF NATALIE JOHNSON

According to State's witness Lionel Powe , Ms. Johnson had alcohol drinks prior to the shooting incident of Doris Smith. She had a very limited opportunity to view the shooting while looking through blinds, which were cracked open.

Upon her initial looking through the cracked blinds Ms. Johnson testified she thought-it was two men standing in the street. Subsequently, Ms. Johnson testified she saw a man chasing a lady. At some point, they got in the middle of the street according to Ms. Johnson and she (the woman) turned around. Neither Marie Jackson nor Lionel Powe testified to seeing anybody stop in the middle of the street nor observing a woman turn around in the middle of the street. In fact, Marie Jackson testified that the two persons crossed the street and ran alongside the house on the sidewalk to the corner of 81st and Houston prior to the shooting.

Upon talking to Detective Chapman regarding what she observed on the night of the shooting Ms. Johnson never gave a description of the shooter. In fact, her inconsistent testimony when compared with two other State's witness (Marie Jackson and Lionel Powe) regarding the man and woman stopping in the street and the woman turning around causes serious question regarding her ability to observe. Her account of the position of the shooter in relation to the victim while being shot is also totally inconsistent with the physical evidence in this case. Based on these serious discrepancies in the testimony of Ms. Johnson coupled with physical evidence as testified by the medical examiner and her limited vision of the shooting-all these factors contributed to the mistaken identification of Rodney Clemons as being the shooter in this case.

3.     The medical examiner testifying for the State testified as an expert in forensic pathology. He reviewed the report of Postmortem Examination of Doris Smith prepared by Dr. Lee Tasha Zemrus, M.D. According to Dr. Zemrus report Doris Smith had two major wounds; entry wound to the right upper back and through and through gun shot wound of the left hip. According to the medical examination testifying at trial Dr. Zemrus examination of the skin about the wound of entrance revealed no evidence of close range firing.

The medical evidence in this case is totally inconsistent with Natalie Johnson's testimony that the offender shot the victim (Doris Smith) at close range. Moreover, Marie Jackson, Lionel Powe, and Natalie Johnson all testified that the shooter shot Doris Smith in the head. The physical evidence is wholly inconsistent with Doris Smith sustaining an entry wound to the head. This fact alone shows the State's witnesses who allegedly observed the shooting are at odds with the physical evidence in this case which once

again questions their ability to observe the sequence of events during the actual shooting. The medical examiner's finding do not corroborate the State's occurrence witnesses in this case. Nor were there any shell casings recovered at the southeast corner of 81st and Houston to corroborate Doris Smith had been shot at that location. The only evidence of shell casings recovered in this case were found in the alley to the rear of Marie Jackson's home.

4. The court committed reversible error when it allowed, over defense objection, Doris Smith daughter, Natasha Smith testify to the following impermissible hearsay:

A. That Doris Smith said she wanted Rodney Clemons to stay away from her;

B. That Doris Smith stated that she didn't want to talk to him (Rodney Smith) anymore.

This evidence constituted impermissible hearsay and violated the Defendant's right to confront a witness against him because it was based on an out-of-court statement made by the victim, who did not testify at trial. See Crawford v. Washington. 541 U.S. 36, 158 L. Ed. 2d 177, 124 S.Ct. 1354 (2004).

The Crawford decision held that in order to satisfy the confrontation clause of the sixth amendment, testimonial statements of a witness who is not present at defendant's trial, are admissible only if (1) the declarant is unavailable and (2) the defendant had an opportunity to cross-examine the witness at the time of the statement. Crawford, 541 U.S. at 68, 158 L. Ed. at 203, 124 S. Ct. at 1374.

In the instant case, the admission of Doris Smith's statements through Natasha Smith violated Crawford and, thus, Defendant's confrontation rights. It is clear defense counsel did not have the opportunity to cross-examine Doris Smith. Because of this Natasha Smith's testimony regarding her mother's statements was inadmissible at defendant's trial under the dictates of Crawford.

The rule against hearsay allows a witness to testify only as to facts within their personal knowledge and not as to what others tell them. The basis for excluding evidence under the hearsay rule lies in the fact that an opportunity to ascertain the veracity of the testimony is absent. People v. Armstead, 322 Ill.App.3d 1, 11 (2001).

This hearsay testimony was highly prejudicial against the defendant because it suggested to the jury that Doris Smith and the defendant had an adversarial relationship, which provided a motive for defendant to harm her. This inference was exacerbated through other testimony at trial showing a legal document was found in Doris Smith purse, which included both Doris Smith and Rodney Clemons's name on it.

5. Natasha Smith was severely impeached during her testimony by another State's witness Detective Chapman, wherein she stated at trial the following statements which had not been disclosed to Detective Chapmon when he spoke to her on August 26, 2001:

A. A week before the shooting of Doris Smith, her mother told her she wanted Rodney Clemons to stay away and she didn't want to talk to him anymore; (this evidence was shown to be outright lie since it was Doris who called Rodney to the truck to talk with him outside the liquor store on August 26, 2001).

B. That Rodney had been calling Doris 3-5 times a day;

C. That Rodney was banging on the door to Doris Smith apartment when he arrived there looking for her on August 26, 2001;

D. That Rodney told Natasha that he would give Doris Smith his check;

E. That Rodney was walking up and down the stairs pacing outside the apartment.

F. That Rodney called Natasha on the telephone looking for Doris prior to arriving at the apartment.

That the above testimony heard at trial for the first time four years after the shooting of Doris Smith constituted recent fabrication by Natasha Smith and painted the picture before the jury that Rodney was a desperate man bent on doing harm to Doris Smith since she no longer wanted a relationship with him. This testimony was highly prejudicial to the Defendant since the State argued in closing argument that Rodney couldn't accept Doris Smith quitting him and she was seen in the truck with "Buck" Lattiker earlier during the night prior to the shooting of Doris Smith.

6. That the State committed reversible error, after a conference with the court on a motion in limine by Defense counsel to bar testimony that the paper found in Doris Smith's purse after her shooting was an Order for Protection filed against Rodney

Clemons (of which he hand no knowledge). It was agreed that the State would only refer to this paper as a "document". However, during its direct examination of Detective Chapman, the State violated both the letter and spirit of its promise to the court when the State in leading the witness brought out the fact that the paper found in Doris Smith purse was a document a legal document, which contained both Doris Smith and Rodney Clemons name on the document.

The trial court should not have tolerated the State breaking promises to the Court then trying to benefit from its conduct. The State's actions inferred to the jury that since the paper found in Doris Smith purse was a legal document containing both Doris Smith and Rodney Clemons name it must have been either an Order of Protection or battery complaint filed by Doris against Rodney due to their volatile relationship brought out through the testimony of Natasha Smith. This evidence was highly prejudicial against the defendant and left the unwarranted inference before the jury that the defendant was a violent man. Such conduct by the State undermines the entire legal process and denied defendant his right to a fair trial. This is what make the prosecutor's comments so damaging. The prosecutor could have and should have spoken in a generic fashion about the document recovered from Doris Smith purse. As a result, the Defendant did not receive a fair trial. It does not matter that Defense counsel failed to object to the State's comments – regarding it's violation of the motion in limine as the damage was already done.

7. The State committed reversible error when it failed to disclose to Defense counsel the alleged oral statements made by the Defendant to ASA Sears consisting of a two page document reduce to writing after the second day of trial. This resulted in unfair prejudice to the Defendant. The purpose of the discovery provision is to afford the accused protection against surprise, unfairness and inadequate preparation. Had Defense counsel been apprised of such oral statements attributed to the Defendant prior to trial he would have proceeded with a motion to suppress said oral statements.

The testimony of ASA Sears was devastating to the defense for the following reasons:

A. The oral statement attributed to Defendant was that Rodney Clemons told her "there was no way anybody could have been close enough to

see his face. There were no houses close enough that someone could look out of".

B. That Defendant told ASA Sears that "he and the victim argued on Houston a few days ago and that everyone in the neighborhood knew that he and the victim always argue".

These oral statements attributed to the Defendant were exacerbated when during closing argument the State argued that Rodney Clemons thought no one could see his face since there were no houses close enough to look out of. Such statements made by the State during closing argument over-emphasized this evidence importance and caused prejudice against the Defendant, thereby mandating reversal of his conviction.

8. That the Defendant received ineffective assistance of counsel when Defense counsel failed to request that the oral statement s attributed to him were not requested to be barred from being heard by the jury by denying ASA Sears testimony regarding the alleged oral statements testify due to the discovery violation; Defense counsel seeking a mistrial; or Defense counsel requesting s continuance in the trial. Thus, Defendant's counsel performance fell below an objective standard of reasonableness and the Defendant was prejudiced by his Counsel's substandard performance.

9. That this was not a case of overwhelming evidence against the Defendant given the fact that there was no weapon recovered at Defendant's home at the time of his arrest and there was no other physical evidence linking him to the crime. Therefore, due to the above cited errors and omission the State failed in its burden to prove beyond a reasonable doubt that the Defendant committed each offense for which he was found guilty.

10. The verdict is against the weight of the evidence.

11. The defendant was denied equal protection of the law.

12. The Defendant was denied due process of law.

13. The People failed to prove every material allegation of the indictment beyond a reasonable doubt.

14. The Court erred in denying the Defendant's motion for a directed finding at the close of the People's case.

15. The verdict is based upon evidentiary facts which do not exclude every reasonable hypothesis consistent with the innocence of the Defendant.

WHEREFORE, for the various reasons urged before and during the trial, and every error as may appear from the official transcript of proceedings Defendant request this Honorable Court to vacate respective findings and judgments thereon, dismiss the proceedings against him with prejudice, or grant him a new trial.

**Respectively submitted,**

William H. Laws

**William H. Laws**

**William H. Laws # 25036**
**Attorney for Rodney Clemons**
**134 North LaSalle**
**Suite 1120**
**Chicago, Illinois 60601**
**(312) 236-3925**

EXHIBIT 2

THIRD DIVISION
MARCH ●, 2008

NOTICE
The text of this order may be changed or corrected prior to the time for filing of a Petition for Rehearing or the disposition of the same.

No. 1-05-3290

---

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

---

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, | ) Appeal from the ) Circuit Court of ) Cook County. |
| v. | ) No. 01 CR 23332 |
| RODNEY CLEMONS, Defendant-Appellant. | ) Honorable ) Henry R. Simmons, Jr., ) Judge Presiding. |

---

O R D E R

Following a jury trial, defendant Rodney Clemons was convicted of first degree murder for fatally shooting his girlfriend, Doris Smith. The trial court subsequently sentenced defendant to 20 years' imprisonment on the murder conviction, plus an additional 25 years for personally discharging the firearm that caused Smith's death, for an aggregate term of 45 years' imprisonment.

On appeal, defendant contends that the trial court erred when it failed to conduct an inquiry into defendant's alleged *pro se* posttrial claim that trial counsel rendered ineffective assistance. Defendant also asserts that his mittimus should be corrected to reflect the proper number of days' credit for time served in custody. We affirm and correct the mittimus.

Because defendant does not contest the sufficiency of the evidence to sustain his conviction, a detailed discussion of the facts of this case is unnecessary. It is sufficient to say that the evidence established that about 1:30 a.m. on August 26, 2001, defendant arrived at Smith's house demanding to know where she was. After learning she was not home, he ran from the house in a rage yelling "[s]omebody is going to die tonight." Approximately 25 minutes later, four eyewitnesses heard gunshots, saw defendant chasing Smith out of an alley, saw defendant shoot Smith, and saw Smith fall to the ground. Each of the four witnesses identified defendant in a police line-up and in court. Deputy medical examiner Michel Humilier testified that Smith died from multiple gunshot wounds and the manner of death was homicide.

Assistant State's Attorney (ASA) Bronwyn Sears testified that, after advising defendant of his Miranda rights, she interviewed him and he denied having anything to do with Smith's murder. Defendant told Sears that he did not know what happened to Smith in the alley, although neither Sears nor the police had mentioned the alley to him. Defendant further told Sears that no one could have seen him on the street because there wasn't anyone there who would have been close enough to see his face, and anyone who claimed they saw him in the alley was lying. The jury found defendant guilty of first degree murder and found that he personally discharged the firearm that caused Smith's death.

At a subsequent hearing on defendant's motion for a new trial, defense counsel argued, *inter alia*, that the State committed a discovery violation that severely prejudiced defendant when it failed to disclose his statements to ASA Sears to the defense prior to trial. Counsel further argued that he rendered ineffective assistance when he failed to object to the statements, or request a continuance or mistrial. The State replied that counsel did receive a copy of defendant's statement to Sears a year before the trial, and produced a discovery receipt signed by defense counsel. The State further argued that it was "bizarre" for counsel to argue that he was ineffective because he did not like his own trial strategy, and that it would be ridiculous to entertain such a claim at the posttrial hearing. The trial court found that the statement was tendered to the defense and that counsel should not have been surprised when it arose at trial because he is an experienced defense attorney and it is common practice in all murder cases that an ASA from felony review comes to the police station and takes a statement from the accused. The court then denied defendant's posttrial motion.

At sentencing, defendant made a statement in allocution in which he proclaimed his innocence and stated "I had no knowledge of any statement in my discovery given me by my defense counsel which is ineffective." The trial court noted that defendant was maintaining his innocence, but stated that the jury disagreed and

believed the testimony of the State's witnesses. The court did not inquire into defendant's comment in his allocution statement, which is the basis of this appeal.

Before this court, defendant contends that the trial court erred when it failed to conduct an inquiry into his alleged *pro se* posttrial claim that trial counsel rendered ineffective assistance as required by People v. Krankel, 102 Ill. 2d 181 (1984). Defendant argues that, based on his statement "I had no knowledge of any statement in my discovery given me by my defense counsel which is ineffective," the trial court was required to inquire into the factual basis for his claim, regardless of the manner in which his *pro se* allegation arose. Defendant claims that he alleged that counsel never informed him prior to trial of a certain "statement" in his discovery, which likely was the incriminating statement he allegedly made to ASA Sears; however, he asserts that his claim is unclear because the trial court failed to make the required inquiry.

The State argues that the trial court was not required to conduct a Krankel hearing in this case because defendant did not assert a *pro se* claim that counsel rendered ineffective assistance. The State asserts that defendant's statement in allocution was a profession of his innocence and a plea for a light sentence in which he merely used the word "ineffective." The State argues that to initiate a Krankel hearing, defendant

must raise a specific claim of ineffective assistance of counsel with supporting facts, and he failed to do so here.

Defendant replies that his statement was sufficient to trigger a Krankel inquiry, and argues that he only had to bring his claim to the trial court's attention. He further asserts that the trial court was aware of the facts supporting his statement because minutes before he spoke, there was a discussion regarding his incriminating statement to ASA Sears during the hearing on his motion for a new trial.

Where defendant raises a *pro se* posttrial claim that trial counsel rendered ineffective assistance, the trial court should examine the factual basis of the claim to determine if it has any merit. People v. Moore, 207 Ill. 2d 68, 77-78 (2003). On review, the appellate court determines whether the trial court's inquiry into defendant's *pro se* claim was adequate. Moore, 207 Ill. 2d at 78.

Although the pleading requirements for raising a *pro se* posttrial claim of ineffective assistance of counsel are relaxed, defendant is still required to meet the minimum requirements necessary to trigger a preliminary inquiry by the trial court. People v. Bobo, 375 Ill. App. 3d 966, 985 (2007). To initiate the trial court's inquiry, defendant must raise a specific claim supported by facts, and bald allegations that counsel rendered ineffective assistance are not sufficient. People v. Radford,

359 Ill. App. 3d 411, 418 (2005). The trial court does not have to inquire into any claims that are conclusory, misleading, legally immaterial, or fail to raise a colorable claim of ineffective assistance of counsel. Bobo, 375 Ill. App. 3d at 985, citing People v. Johnson, 159 Ill. 2d 97, 126 (1994). The trial court cannot be expected "'to divine such a claim where it is not even arguably raised.'" People v. Harris, 352 Ill. App. 3d 63, 72 (2004), quoting People v. Reed, 197 Ill. App. 3d 610, 612-13 (1990).

In the instant case, defendant alleges that he raised his *pro se* posttrial claim of ineffective assistance of counsel at sentencing. The record shows that, in allocution, defendant stated to the trial court:

> "I would just like to tell you that the charges, your Honor, I'm innocent of the charges. And I had no knowledge of any statement in my discovery given me by my defense counsel which is ineffective. The State made me out a thief. I'm not. I wasn't that young man that night these people claim that they think was [*sic*]. I never killed or hurt anybody in my life, your Honor. To let the verdict stand, your Honor, I got a son that has to grow up thinking that his father hurt his mother. Which is not true. Over the four years, there were people out there, that even counsel talked

to. They know better. Still knowing. I'm standing here accused of a crime of killing their mother and I would demand justice. I've done all I could. I put it in the hands of my defense counsel. Your Honor, I just ask that you search your soul and go over this case. Thank you."

We find that defendant's statement failed to raise a colorable claim that trial counsel rendered ineffective assistance as it did not state a specific claim with supporting facts. The challenged statement, "I had no knowledge of any statement in my discovery given me by my defense counsel which is ineffective is basically nonsensical. Reading the statement in the context [illegible] defendant's full statement in allocution does not provide [illegible]rther clarification as the remainder of his statement [illegible]n assertion of his innocence. We note that another phrase i[illegible] statment "there were people out there, that even counsel [illegible]d to appears to voice satisfaction with counsel's investig[illegible] of [illegible]e case and attempt to find witnesses favorable for the [illegible]se. [illegible]he trial court was not expected to intuitively [illegible]rceiv[illegible] ai[illegible]e one was not arguably raised. Harris, 352 [illegible]. Ap[illegible] at 7[illegible]. We find that defendant failed to meet the [illegible]inimum re[illegible] necessary to trigger a preliminary inquiry [illegible] thus, the court did not err when it di[illegible] [illegible] the co[illegible] [illegible] co[illegible] su[illegible] [illegible]uiry.

In addition, we are not persuaded by defendant's contention that the trial court should have perceived his statement as a *pro se* allegation of ineffective assistance of counsel in light of the immediately preceding discussion during the hearing on his motion for a new trial regarding his incriminating statement to ASA Sears. During that hearing, and in his written motion for a new trial, defense counsel explicitly raised an allegation that he, himself, provided defendant with ineffective assistance when he failed to object to the admission of the incriminating statement at trial and failed to move for a continuance or mistrial. The trial court considered counsel's argument on this issue and rejected his claim. Accordingly, as counsel had already raised the issue of his own ineffectiveness related to the alleged discovery violation and his failure to act when Sears testified to the incriminating statement, and the trial court had already ruled on the issue, defendant was precluded from separately raising the same issue in a *pro se* motion.

Defendant next contends, and the State agrees, that he is entitled to sentencing credit for 1,503 days served, rather than 1,484, and that the mittimus should be amended to reflect the correct number. Pursuant to our authority (134 Ill. 2d R. 615(b)(1); People v. McCray, 273 Ill. App. 3d 396, 403 (1995)), we direct the clerk of the circuit court to amend the mittimus to

reflect that defendant is to receive 1,503 days of credit for time served.

For these reasons, we affirm the judgment of the circuit court of Cook County and amend the mittimus.

Affirmed; mittimus amended.

**GREIMAN, J., with THEIS, J., and CUNNINGHAM, J., CONCURRING.**

CERTIFICATE OF COMPLIANCE

I, Jessica D. Pamon, certify that this brief conforms to the requirements of Supreme Court Rules 341(a) and (b) and 315(d). The length of this brief, excluding the appendix is 17 pages.

Jessica D. Pamon
JESSICA D. PAMON
Assistant Appellate Defender

EXHIBIT 3

**LEWIS MYERS, JR.**
Attorney at Law
25 E. Washington Street
Suite 1225
Chicago, IL 60602
(312) 236-8004
lmyersatt@aol.com

*****FAX*****

---

**TO:** William Laws
Attorney at Law
(312) 236-3625

**FROM:** Rita Howard
Law Office of Lewis Myers
(312) 236-8804

**RE:** 911 Emergency call August 26, 2001

**PAGES:** 3 including cover

**DATE:** December 23, 2005

**cc:**

---

*****NOTICE OF CONFIDENTIAL INFORMATION*****

The information contained in this facsimile message is CONFIDENTIAL INFORMATION and may also be LEGALLY PRIVILEGED, intended only for the individual or entity named above. If you are not the intended recipient, you are hereby notified that *any use, review, dissemination, distribution or copying of this document is strictly prohibited.* **If you have received this document in error, please immediately notify the sender by telephone at (312) 236-8004 or return fax to (312) 236-8804 and destroy the original message.**

---

**MESSAGE(S)**

**EXHIBIT 3**

911 Emergency Call
August 26, 2001
Derrick Clemons, Caller

Operator: Chicago Emergency, Ortiz.

Caller: Okay, we just had another shooting. There's a male, black, has a afro, light colored shirt–

Operator: How old is he about?

Caller: Over 20. He's got a light colored shirt.

Operator: How tall is he?

Caller: About 5'7, 5'8.

Operator: Heavy, medium or thin?

Caller: About 160-165 lbs.

Operator: And he has an afro?

Operator: Alright, what's he wearing?

Caller: A light colored shirt, white or yellow. It could be white. It has nothing on it. Just a white oversized shirt.

Operator: What color pants?

Caller: Dark pants. Dark pants. He was shooting a prostitute or someone. There's a bad deal that went down in the alley of, uh, between 80th and Houston and, uh, between 80th and Cole at 81st Street.

Operator: At 81st Street?

Caller: 81st Street, yeah. They were running. They were running westbound, I believe they may have gone towards 80th. And there's drug activity going on on that block. This is the second shooting–

Operator: Okay, this guy, now, where's he at? He's on 80th and Houston?

**EXHIBIT 3**

Caller: I don't know where he is now. He went west. He was chasing the woman down the street. It was a heavyset woman. She may have been a drug buyer. It was a deal went bad. There was an argument and they went down the street at 81st Street. They could have gone towards 80th Place or 80th Houston, on the 80th block. I don't see her, I don't see him. I believe they might have turned around the corner. He went after her. She's a heavyset woman. I think dark skinned, uh, hands...I couldn't tell, it was kind of dark.

Operator: Okay. I'll tell the police.

Caller: Please do. This is the second shooting now in an hour.

Operator: Oh my goodness. Okay.

Caller: Yes. Thank you.

time that I attempted to play the contents of the 911 tape that was reported to the police by Derric Clemmons, there was language where he specifically referred to a prostitute being in the alley. At that time, Judge, you said it was premature based on his conclusion that being in the alley at that time of night, she may have been a prostitute. I was told, Judge, that in order to prove it up, I'd have to bring in someone that had personal knowledge of an intimate relationship where monies were exchanged between Doris Smith and that person for purposes of an act of prostitution.

THE COURT: Yes. And what's he going to testify to?

MR. LAWS: He's going to testify, Judge, that on more than one occasion he has given money to Doris Smith for sexual favors.

THE COURT: And therefore what? That means what?

MR. LAWS: Therefore, that she not only had sex with him for money, that being present when Doris Smith was in a crack house, other men gave her money, went upstairs, came down after about five minutes and that --

THE COURT: All right. And that means what? Ultimately what do you want to argue from that?

MR. LAWS: I want to bring out, Judge, that Derric Clemmons' conclusion that the woman was a prostitute was

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CRIMINAL DIVISION**

PEOPLE OF THE STATE OF ILLINOIS )
Plaintiff, )
)
-vs- ) NO. 01 CR 23332
)
RODNEY CLEMONS )
Defendant. )

FILED
700 TIME ___ AM PM
MAR ... 5
Dorothy Brown
Clerk of the Circuit Court
Criminal Division
Deputy Clerk Signature

**SUPPLEMENTAL ANSWER TO DISCOVERY**

Now comes the Defendant, Rodney Clemons, by and through his attorney, WILLIAM H. LAWS and in supplemental answer to the State's Motion for Pre-Trial Discovery states as follows:

1. The Defense which the defendant intends to assert at trial is that of not guilty, and he will charge the State with the burden of proving him guilty beyond a reasonable doubt on the evidence and testimony adduced at trial. The Defendant asserts the affirmative defense of alibi.

2. The names and addresses of those persons whom the defense may or may not call as witnesses at trial are as follows:

Sharon Lee
8039 Muskegon
Chicago, Illinois

Kerry Kendricks
8025 Muskegon
Chicago, Illinois

Myra Clemons
835 Hirsch Avenue
Calumet City, Illinois

Andre Smith
8125 South Escanaba
Chicago, Illinois

Dale Latiker
8042 South Exchange
Chicago, Illinois

Victor Latiker
8052 South Escanaba
Chicago, Illinois

Annette Willingham
8116 Houston
Chicago, Illinois

Doris Bell
8021 South Houston
Chicago, Illinois

Along with any and all names listed in Arrest Reports, Vice Case Reports, and Supplemental Reports.

Investigation Continues.

3. The defense will inform the State and will permit the inspection and copying of any and all reports, examinations, tests and reports of statement of experts which defense counsel has in his possession, as called for in Paragraph 3 of the State's Motion For Discovery.

4. The Defense will furnish the State with any books, papers, documents, photographs or tangible objects the defendant or his attorneys intend to use as evidence or impeachment at trial, as called for in Paragraph 4 of the State's Motion For Discovery.

5. The Defense will notify the State of the evidence of any material or information subject to disclosure which is discovered subsequent to compliance with any orders entered pursuant to Illinois Supreme Court rules 413 ( c ) and 413 ( d ).

Respectfully submitted,

William H. Laws

William H. Laws # 25036
Attorney for Rodney Clemons
134 North LaSalle
Suite # 2110
Chicago, Illinois 60602
(312) 236-3925

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

AFFIDAVIT

I, ANDRE SMITH, being first duly Sworn under oath depose and states that the following information within this affidavit, is true and correct in substance and infact to the best of my knowledge.

That I am a friend of Rodney Clemons, that on August 26,2001, I Andre Smith, saw Rodney walking from a white van, this was about a little after 1:00 a.m. in front of four star liquars on 82nd and Exchange Street in Chicago, Illinois County of Cook.

Rodney, asked me to drive him to his girlfriend house Ms. King because she left him at four star liquars, in which her name is Priscilla King. I, and Rodney drove to 7931 So. Escanaba Street Rodney went inside for a few minutes, and return back to the truck, At this time Rodney said that he needed to meet with a person name Jamaca, but Jamaca was not on Exchange Street when Rodney went there to meet with him on Exchange.

I, park my truck on South Escanaba Street in Chicago, then Rodney and I, walked one (1) block over to Doris Smith house, in which she is no relation to the above name which is me. her address is 8134 So. Muskegon Street, as we got there to her house Rodney went insde while I waited down stair in front of the biulding after a few minutes Rodney returned, We walked back over to Rodney's girlfriend house Ms. King.

I, and Rodney talked for awhile in the front of Ms. King's house, then Rodney said that he was turning in for the night after he went in the house I, notice that the time was after 2:00 a.m. I, then left and went home. I know that Rodney could not have been involved in this crime of Doris Smith because he never,never left my side on that August 26, 2001.

If I, were called upon to testify, on behalf of Rodney Clemons I, would testify to the above mentioned as I, know it. I am making this Affidavit, of my own free will.

SUBSCRIBED and SWORN to before me this 28 day of Dec 2007.

Carmelita Hollister
NOTARY PUBLIC

"OFFICIAL SEAL"
CARMELITA HOLLISTER
Notary Public, State of Illinois
My Commission Expires Dec. 18, 2011

Andre Smith
ANDRE SMITH (Affiant)
8126 So. Escanaba St.
Chicago, Illinois 60617

A. I know what the detectives told me, but again I was not present with any interview with the defendant and the detectives.

Q. And with respect to being over on Houston, you don't know during the course of the conversation with the detectives and Rodney Clemons they mentioned to him the location of 81st and Houston as being the location of the shooting, do you?

A. No, I was not present.

Q. You weren't personally present, correct?

A. No.

Q. So you had no independent knowledge of why Rodney Houston would have used the alley on Houston, correct?

A. No.

MR. LAWS: No further questions.

REDIRECT EXAMINATION

BY MR. BYRNE:

Q. Miss Sears, part of your job is to meet with the detectives and review the facts of the case with them, is that correct?

A. That's correct.

Q. And your understanding after speaking with the detectives in reviewing the reports is that nobody had

A. Yes.

Q. Now, officer, from the -- you are familiar with the area of 81st and Houston, correct, sir?

A. I've been there before, yes.

Q. And you know the street in that area, do you not?

A. I'm sorry?

Q. You know the streets in that area, do you not?

A. No, I'm not very familiar with that particular area. I've only been there a couple of times. If I went there, I would get lost.

Q. So you've only been to the area a couple of times?

A. Yes.

Q. I see.

Well, you were able to find where Natasha Smith lived, weren't you?

A. Yes.

Q. And when you talked to Natasha Smith, she never told you that Doris Smith told Rodney Clemons she didn't want to see him anymore, did she?

A. No, I don't recall her telling me that.

Q. When you talked to Natasha Smith that night, she never told you that Rodney Smith had called Doris

STATE OF ILLINOIS )
) SS:
COUNTY OF COOK )

**AFFIDAVIT**

I, Natasha Smith, Being first duly sworn under oath, depose and states that the following within this affidavit, is true and correct in substance and in fact:

That on or about August 26, 2001, I Natasha Smith, the daughter of Doris Smith, was interviewed by detectives concerning the death of my mother. Detective Chatman #21313, informed me that my mother was decease and made various inquiries regarding her death, as well as her ex-boyfriend Rodney Clemons. It was clear that Rodney was the only person of interest to the detective because he was my mother's ex-boyfriend, detective Chatman never even bothered to inquire or identify anyone else that may have committed this crime against my mother. Det. Chatman, ask me what Rodney said when he came that night, I told him Rodney said that there is alot of shooting outside, somebody is going to die, and he was very concerned about where my mother was. Detective Chatman changed my statement to I saidRodney was enraged and stormed form the building stating that he was going to kill someone and thats not true. I'm making this affidavit and recanting my testimony/statement/lies. And yes at the time of my mother's Doris Smith death, I would have believed anything anybody would have told me at that time about Rodney, because detective Chatman said they had witnesses that seen Rodney commit this crime, which turn out to be lies that was revealed to me and my entire family. Ask yourself, if it was your moth mother what will you do? Detective Chatman, lead me to believe through lies and trickery that Rodney Clemons committed this crime. He also changed my statement without me reading it or knowing what it said.

It took four years for my family and I to find out the lies at trial because the detective in this case took the stand during Rodney trial couldn't answer questions, and did not know anything about my statement being changed, because I my self changed my statement with the State's Attorney at trial in order to secure a conviction. Although I had serious doubts that Rodney would be involved in my mother's death, I was emotional at that time and confused. Rodney arrived at our house on Aug 26, 2001 between 1:00 and 1:30 a.m. He was wearing green pants, white T-shirt with a black nike T-shirt over it. I and my uncle Charles Evans told this to det. Chatman and he did not write it in his report. Rodney also had a thick mustache and long beard. And he did not have on black gym shoes, black pants and a big baggie white, red or yellow T-shirt like discribe.

Once my family and relatives heard the testimony of the witnesses at trial, it was then that me and my family member clearly knew that Rodney Clemons had absolutely no involment in the death of my mother because he was at my house when the shooting first started at 1:30 and 1:35 a.m.

I Natasha Smith, If I were called upon to testify on behalf, Rodney Clemons, I would in fact testify to the above-mentioned facts that are within this Affidavit sworn to under her Oath, I am the person that makes this document/affidavit, and that I, have not been promised or threats to come forewards in this matter.

/S/ Natasha Smith
Natasha Smith
8212 So. Muskegon
Chicago, Illinois 60617

SUBSCRIBED and SWORN to before me this 15th day of January, 2007.

NOTARY PUBLIC

"OFFICIAL SEAL"
ANTIONETTE L. AMES
Notary Public, State of Illinois
My Commission Expires June 07, 2009